I'm going to depart from my usual approach with respect to our argument and perhaps take on a slightly different tack than what the courts have been accustomed to. I'm not going to start by telling you everything that is wrong about what the other side's position is, but to tell you that we actually agree about something. The point of agreement is this. The appellee says that there was a genuine dispute as to coverage. It says that to bolster its argument that it reasonably relied on advice of counsel. That admission we submit establishes our case in its entirety. The standards that we apply when a tender of defense is requested for an insurance coverage issue is measured at the time that the complaint incepts and is tendered to the insurer. At that point, the insurer's duty is to review the four corners of the complaint, to evaluate it, and if it finds that it cannot unequivocally, absolutely exclude all possibility of coverage, it must acknowledge its duty to defend. That's in Montrose. That's in Safeco. That's the law of this land. What this insurer did in response to a tender that occurred in October of 2006, it did not respond acknowledging that there is a genuine issue as to coverage and therefore we will provide you a defense. Instead, it waited until June of 2007, some nine months later, at which point it asserted three bases on which it was denying coverage. That's simply wrong. That's not what it was supposed to do. And the insurer acknowledges that there was a genuine dispute as to coverage. Applying the standard, it had only one thing it could do. Acknowledge its duty to defend, provide a defense, and if extrinsic evidence was developed later in the case that gave it a basis to conclude that there was absolutely no possibility of coverage, not disputed facts, but adjudicated facts, undisputed facts, then it could withdraw its defense. But it could not refuse to provide the defense. That's what State Farm did here. Now, if we look at the tender, the denial that they provided back in June of 2007, there are three bases that are asserted. The bases that are asserted are that there was no advertising injury offense in the course of advertising the insured's goods. I'll come back to that one. Second, that the insured cannot have misappropriated its own photos. And third, that Marilyn Monroe's photos is not an advertising idea or style of doing business. These three articulated bases for denial completely ignore the specific express allegations of the complaint. Beyond that, they misconstrue the allegations of the complaint. For example, at no time did NOVA, the plaintiff in the underlying case, accuse Tom Kelly Studios, the insured, of misappropriating Marilyn Monroe's image by use of Marilyn Monroe's photograph. Instead, what they accused the insured of was misappropriating NOVA's trade dress, which NOVA contended was the use of Marilyn Monroe's photographs, no matter what photograph, on wine bottles. That, they concluded, they claimed, was their trade dress. They said the defendants had appropriated that trade dress. How had Tom Kelly appropriated the trade dress? I understand how Adler allegedly did that, but I found this actually a little bit tricky, because it wasn't clear that there was a course of advertising Tom Kelly's goods, products, or services, which would be, I guess, the licenses to use the photos. Can you address that? Certainly. I think it's important to understand the relationship between Tom Kelly and Adler Fells in this context. The complaint alleges, and it is true, that Tom Kelly Studios approached Adler Fells with the suggestion that they, together, produce a Marilyn wine that used the red velvet photographs. The red velvet photographs are particularly iconic and famous. They were the ones of Marilyn Monroe in the nude on red velvet. They were the ones that were launched, Playboy, on its first edition as a centerfold. They're a collector's item, and so there was a significant potential for appeal and premium value that could be created with a product that bore those photographs. Adler Fells accepted that agreement and agreed to take a license to share with Tom Kelly Studios the profits associated with the sales of those goods. Together, they formulated the product, they agreed on what its appearance was to be, the agreement provided about Tom Kelly's approvals were required, and all of that is alleged in the complaint. In fact, the complaint goes further. It says that when Adler Fells initially announced the product, or was going to, and Nova found out about it, they talked to Adler Fells and thought they had convinced them to stop, but that Adler Fells thereafter decided to go forward with the product at the insistence and encouragement of Tom Kelly Studios with an agreement to indemnify. So I saw the allegations in the complaint that Tom Kelly Studios was in cahoots with Adler Fells, but that still wouldn't get insurance coverage unless there was a course of advertising of Tom Kelly's goods, products, or services. So it wasn't clear to me whether the being in cahoots allegations really helped with the argument that there was insurance coverage here. Certainly. Let's address that. Two parts to that equation.  What advertising was conducted? The policy requires that there be advertising injury resulting from advertising of the insured's products. It does not say that it must be advertising by the insured. In fact, that's language that they insert into the policy that's simply not there. As long as there's advertising of the insured's products, you've got a course of advertising that's associated. Now, there are two pieces of advertising that occurred here. One was the Adler Fells notice to retailers saying, coming soon, this fabulous Tom Kelly-Adler Fells collaboration with this fabulous product, iconic picture. Look for it. Coming soon. Now, does that count as advertising under the California test, which says it has to be disseminated to the public? Because I thought that email was to just a group of distributors. It was to the trade. The policy did not define advertising at this iteration of the policy to be required to the public at large or in any particular form. Subsequent versions of the ISO policy have defined advertising as requiring widespread advertising to consumer and purchasers. But this policy didn't. So the California cases that construe advertising that way, you're saying it would not be applicable? They're not applicable to this particular policy. Now, the other piece of advertising that occurred, occurred on the Maryland Fine Wines website, which is a website maintained by Pacific Licensing, which is an agent of Tom Kelly Studios.  And it did show the product, and it did promote the sale of the wine with the photograph on it, which NOVA says is an appropriation of their trade dress. So there was advertising. And the claim clearly is asserted that this advertising gives rise to injury. Now, you know, at the end of the day, after litigation, it may very well have been proved that NOVA never suffered any injury or couldn't suffer any injury or maybe even didn't have a valid trade dress. But that's irrelevant from a standpoint of coverage, determination, or duty to defend at the outset of the case. Could I get back to the website for a moment? Certainly. Was there evidence that the website constituted a wide dissemination to the public? You know, obviously it was accessible by the public, but that doesn't necessarily mean that the information on it was disseminated. There are billions of websites throughout the world. Well, I don't think that there was any specific inquiry as to that at any level in these cases. But frankly, I would be shocked at the suggestion that if I bought a newspaper advertisement in the L.A. Times and cannot show that anybody particularly looked at that newspaper, that that's not advertising. That's advertising. I placed it out there. And it's available for all to see. And hopefully, if I spent my money well, somebody actually is going to see it and take notice of it. This website was up there. This ad and notification was up there. It was not directed to an isolated, limited class of person. It was available to all. But again, we don't think that this policy requires that. This policy, in its definition, did not include any limitation that required widespread public advertising to promote the goods and services. But the goods were promoted. And the goods were clearly promoted as associated with Tom Kelly Studios, that they were the amalgamation, collaboration between Adler Fells and Tom Kelly Studios that brought this product and made it possible. So we think we've more than satisfied the standard that's required. And the court below acknowledged that the product here is wine with a photograph, not wine by itself. There's no cause of action for wine alone. And there was no cause of action for photograph alone. It was wine with photograph. So it was never Adler Fells' product alone. Adler Fells couldn't produce that product, distribute it, or make it available without the photograph and without Tom Kelly's permission. So the other question I had, as I said, I thought it was a little tricky, is we look at the insurer's reasonable expectation. And I was just thinking, well, Nova also used Tom Kelly photos for a couple of its labels. And so if Nova had been sued for disparagement or something, some advertising injury based on those wine bottles, would State Farm owe a duty of defense to Tom Kelly because those photos had been used in Nova's labels? Well, Nova used the photographs pursuant to a license from Tom Kelly. That license expired. But in other words, Tom Kelly is in the business of licensing its photos. And so presumably everyone who buys the license uses the photos in their merchandise in some way. And so the question is, is it reasonable for Tom Kelly, would that have been in the insurer's mind, that anyone who uses his photos and then is sued for trademark infringement unrelated to the cahoots, this being cahoots element, would State Farm owe him a duty of defense? Is that advertising of Tom Kelly's goods, products, or services? Well, let me make clear. In the context of this case, the tender was not for a defense of Adler Phelps. The tender was for a defense of Tom Kelly's goods. Right. But so Tom Kelly licenses the photos. Everyone who buys a license uses the photos, and everyone who buys the license and uses the photos could be sued for their product or for the product that incorporates the photo. If Tom Kelly is named in those suits, then it's your position that the insurance company would owe Tom Kelly a defense, that Tom Kelly. Yes. It doesn't matter whether Tom Kelly alone distributed those goods or those goods were distributed by customers of Tom Kelly or licensees of Tom Kelly. If they were done at his behest, at his direction, with his permission and consent, then Tom. Is that merely the license, or does there have to be something above and beyond the license? I don't think that there's anything that requires above and beyond the license. But let me, if I might, I think this bears on this issue. The policy actually does define your products, and I regret that while the parties briefed extensively on the issues, we didn't bring to the court's attention the specific language of the policy that defines what your product is. And the policy is ultimately the controlling document. It's the manifesto by which we live. And it appears at ER 152 in the record, and it says, Your product means any goods or products other than real property, manufactured, sold, handled, distributed, or disposed by you, others trading under your name, or a person or organization whose business or assets you have acquired, and containers, other than vehicles, materials, parts, or equipment furnished in connection with such goods and products. So what does this mean? Adler Fells was absolutely positively trading under Tom Kelly's name. It used the Red Velvet Collection, which is a trademark of Tom Kelly Studios. It was using Tom Kelly's name. And the products are the wine bottle using the photograph that was owned by Tom Kelly that's distributed by both Tom Kelly on his website as well as by Adler Fells, and they were trading under his name. And the product not only includes wine, and there is a lot of argument that goes back and forth between the parties and occurred in the underlying proceedings. Well, the product was wine. It wasn't the photograph. The product was a photograph. No, the product was wine with the photograph. And if you want to construe the product as wine, then guess what? The bottle with the label is the container with the identity that's also defined as product within the terms of the policy. So this is clearly a product of the insured. You're actually over time. I'll save any time that you'll allow me for. We'll give you a minute for refinement. Thank you. I was hogging all the questions. Thank you, Your Honors. Good morning. May it please the Court. I'm Kyle Kebeaton on behalf of State Farm General Insurance Company. Let me, if I may, I'm going to do things a little bit out of order too and address a couple of things counsel commented on. And I want to direct my argument and the Court's attention for a moment to the Cahoots discussion that Mr. Sony started with, where he said that the record does show that there was in fact an agreement by and between Kelly and Adler Fells to, as he put it, share in the profits of this venture and to create a product jointly. The problem with that argument is that it takes him directly out of coverage. Because if counsel is going to suggest that there was a joint venture by and between Tom Kelly Studios, Inc. and Adler Fells, Inc., then the State Farm definition of insured comes into play, and that's at the excerpts of record at page 146. And it says specifically, when it defines who is an insured, that no organization is an insured with respect to conduct arising out of a joint venture or other similar agreement. If the liability here and Tom Kelly's involvement was that of a joint venture, where there was a sharing of profits, a sharing of responsibility, and a sharing of product, then that enterprise, that joint venture, is not by definition an insured. We don't even get to the rest of the insuring agreement because there is no insured involved here. So I think that takes a very critical point here because we don't even get to the rest of this. With respect to the goods, products, and services, this is wine. And I think, Judge, you had it correct when you were asking about what the reasonable expectation of the insured is, and whether or not simply because Marilyn Monroe's licensed image by Tom Kelly Studios appears on a product, that State Farm now assumes the risk of every endeavor. How do you address opposing counsel's point about the definition of your product, that here Tom Kelly's name was on the label, as I understand it, and there was some copy about the nature of these photos? Does that meet the definition of your product for purposes of the policy? I don't believe it does, particularly since the product means goods or products that are sold, handled, distributed, or disposed of by you, meaning the name insured. Others trading under your name. Now, simply putting a copyright Tom Kelly Studios on the Marilyn Monroe photograph is not trading under Tom Kelly's name. What does that phrase mean in your view? In my word, it would be, for example, if you had someone who was distributing your product in your name, that you were a licensed distributor, say, for Natural Balance Pet Foods, and you had a Natural Balance name on your truck, and you said, we're a Natural Balance distributor. That's the kind of thing that trading under your name means. It doesn't mean simply that you designate or identify a copyright held by the owner of a photograph. Otherwise, what you end up with is simply an actuarial impossibility for an insurance carrier. That is, they're going to have to try and figure out what possible licenses might be given by an insured to a third party who might commit a wrongful act, and find itself on the hook for indemnifying and defending against that conduct. Counsel, if I could, I'll ask after Judge Akuti. Yes, Your Honor. What I want to object, if I could please, is this. There might be a five-second answer to this. I wonder if the record here showed us how State Farm underwrote this policy. Because I've seen underwriting data be present in some declaratory judgment actions and not in others. So I don't want to know anything not in the record, but I want to know if the record in this case provides us with documents showing how it was underwritten. Your Honor, there is no record, no excerpt in this record, no portion of this record, which reflects the underwriting or the underwriting criteria or guidelines. Okay, thank you. There is no such evidence. Yes, Judge Akuti. Can I ask, here, it wasn't just a copyright line in Tom Kelly. The website has this write-up about Tom Kelly in the meeting with Marilyn Monroe, and it's obviously highlighting Tom Kelly's role in producing these photos. And so why is that not the course of advertising Tom Kelly's products and services along with the wine itself? Because there has to be a causal nexus by and between the advertising activity and the injury complained of by the plaintiff. Tom Kelly's photographs, which might be separately appearing on a website, which, by the way, the record is devoid of hits or visits. We don't even know whether anyone ever visited that website for the period it was up. But the Tom Kelly photographs that are being sold separately, for example, a framed photograph of Marilyn Monroe on red velvet, was not, even if that was advertised on the website, Nova Wines was not complaining of harm or injury caused by the inclusion of Marilyn Monroe framed photographs. They were claiming injury solely by virtue of the fact that Adler Fells was selling a competing wine product. So there may have been other goods, products, or services advertised on the website, but the injury was not caused by that. There's no causal nexus, and this circuit's opinion, for example, in Isle Lab and the California Supreme Court's opinion in Bank of the West make it clear there must be some causal connection by and between the two. At the risk of being redundant, just because I find this case a little tricky, the problem for Nova was that these bottles of wine were being sold with a label, and the label, apparently based on what the website said, had the picture of Marilyn Monroe and the copy about Tom Kelly, and the future advertising, I guess, was going to be this photo and label on the wine. And certainly that was what was causing Nova the problem was that it interfered with this. It was an infringement, allegedly, of its trade dress or trademark. How do we separate the advertising of the Tom Kelly photo and the copy from what was causing Nova the problem? I'm having trouble doing that. If you're talking again about the Tom Kelly product being the photos, that is entirely separate because the fact of selling a photo that doesn't appear anywhere near a label isn't an infringement upon anyone's trade dress. That was not the grabment of claim. If I buy the wine, I'm also buying the photograph, right? Well, you're buying a wine product that happens to have a label on it. I would agree with that, yes. And one of the incentives for me to buy this wine rather than another wine is the photograph. Perhaps. Assuming the wine was ever sold, it may also be the simple great taste of the wine itself. It just happened that way. Again, we get into a point of speculation about consumer motivation, which I don't think advances the cause of Tom Kelly for getting coverage because what we end up with is still the point of what is the good and services being advertised. Tom Kelly didn't make wine. The only way Tom Kelly gets involved with wine is by virtue of this, as Mr. Sony put it, the agreement to share profits, the classic joint venture, which would take us out of coverage. Does the Record Council tell us how many licensees Tom Kelly has? It does not, Your Honor. It only identifies the prior license, I believe, to Nova and the license to Adler Fells. I don't recall that. And if I'm wrong, Mr. Sony can correct me on that. I don't recall anything else on the record.  Now, we know that he was made a defendant, the studio was made a defendant, and he was enjoined by Judge Patel. Yes, Your Honor. That suggests that he ran some potential liability, doesn't it? Well, it certainly means that Judge Patel found there was a basis to stop production and sale of the wine product, yes, but the mere fact that he potentially is liable. If that happens to a defendant, isn't it quite likely he's going to have to pay damages? That may be, but we didn't take the position either in the court below or during the adjustment of the claim that there would be no coverage because this was an injunction only or there was no potential liability to pay damages. While the coverage part does, and the insuring agreement does say that State Farm will pay those sums that the insured becomes legally obligated to pay, we didn't take the position there'd be no coverage simply because this was an injunction case and that was not raised by us at the trial court. Well, I think you're missing my point. I'm sorry. My point is there was potential liability for Kelly. It was clear in the district court and it was clear on the appeal of this court, and then there's the settlement, so we never got a crack at it, but certainly there was a risk this court would have confirmed that. And I don't see how you get around that. In fact, as the proof of the pudding is, there was a legal action. He was found potentially liable. But, Your Honor, potential liability or even actual liability doesn't necessarily mean that the liability is a covered liability or that the insured was covered under the policy or that the claims fell within the insuring agreement. I agree there was an absolute potential that Kelly could be liable. There was a finding by Judge Patel of an injunction, but that doesn't mean that the conduct and the basis for the conduct and the claims asserted by Nova necessarily fell within the four corners of the insuring agreement. And that's the issue here is whether or not conduct, which may have been wrongful, was, in fact, potentially covered. The liability doesn't create the coverage. Theoretically, it's true, of course, but I don't think anybody in the position of the insured would think it's quite likely. Go ahead with your argument. So can I just take you to where opposing counsel started? Sure. Judge, for me, at least, the insurance contract is tricky, whether this is an advertising injury or not. And opposing counsel suggests, well, in these cases of ambiguity, if there is a reasonable dispute about coverage, that's the insurance company's obligation to at least provide a defense. How do you respond to that? Respond to it in two ways, Your Honor. One, the mere fact, I shouldn't say mere, the fact that there is some trickiness to the coverage doesn't necessarily in and of itself mean that the policy is ambiguous or that there is something that should be construed against the insurer. Lots of coverages require detailed analysis. Unfortunately, this was not a corporate slip and fall. That would be very easy. The genuine dispute doctrine, though, however, doesn't, I think counsel begs the question, The genuine dispute doctrine does not mean that there had to be coverage. It means that the positions, albeit wrong, were reasonable. Plaintiff can take a position and say, I think you're covered. I don't think Mr. Stoney violated one bit of Rule 11 in making any of the arguments he made. It was a reasonable, albeit legally incorrect, argument. That's all genuine dispute takes us to. And the converse would be true, for example, in a bad faith case where there was coverage found. The insurer could be wrong. But if the insurer was wrong but still had a reasonable basis for making the assertions, that genuine dispute bars a finding of bad faith. It doesn't mean, by definition, raising genuine dispute admits liability or admits coverage. Otherwise, you would essentially have bad faith arguments or bad faith defenses driving the coverage vote. And that would not be the law in this state, nor has it ever been. And I think everything else is covered in the briefs. Unless the Court has any additional questions, I'll submit. I don't really have questions. Thank you. We'll give you a minute for rebuttal. Thank you. The causal nexus between the advertising and the claimed injury was asserted in the complaint. State Farm's position is it was passing off. The injury didn't, in fact, occur. But it was asserted in the complaint. It was on the face of the complaint. Now, at the end of the day, those allegations may turn out to be false. They may be fraudulent. They may be baseless. But that's irrelevant to the duty to defend as measured at the time of tender. That's what State Farm failed to do. The heated and lively debate we're having about whether it's a product, not a product of Tom Kelly Studios, whether the advertising was sufficient, large, insufficient, all begs the question of what our friends at Montrose told us. And if I might quote Montrose, it says, Facts merely tending to show that the claim is not covered or may not be covered, but are insufficient to eliminate the possibility that resultant damage or the nature of the action will fall within the scope of coverage, therefore add no weight to the scales. The scales remain where they are. The allegations of the complaint clearly set forth the insured was sued. He was sued for trade dress and trademark infringement. He was sued by Inova claiming they suffered damage. They claimed he had advertised, and State Farm owed him a duty, a duty to defend at least. Thank you. Thank you. And now a case of Tom Kelly Studios v. State Farm General Insurance Company is submitted, and we're adjourned until tomorrow. Thank you. All rise. Thank you.
judges: Noonan, Gould, Ikuta